UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION


William Muncy, et al.,                                          Case No. 3:12-cv-00804

           Plaintiffs

      v.                                                    AMENDED MEMORANDUM
                                                           OPINION & ORDER

James R. Beutler, et al.,

          Defendants


### I.     INTRODUCTION

Before me is the motion of Defendants James R. Beutler, *et al.*, for summary judgment. (Doc. No. 86).[1] Plaintiffs William and Nina Muncy oppose the Defendants' motion. (Doc. No. 119). The Defendants have filed a reply. (Doc. No. 128). For the reasons stated below, the Defendants' motion is granted in part and denied in part.

### II.     BACKGROUND

On September 9, 2011, Kevin Siefker, a deputy with the Putnam County, Ohio Sheriff's Department ("PCSD"), arrived at the home of William and Nina Muncy in Belmore, Ohio. Deputy Siefker was looking for the Muncys' daughter Tamera and her husband Donald Bear. The Wood County, Ohio Common Pleas Court had issued felony warrants for Tamera and Donald, after they

---

[1] The Plaintiffs filed two separate actions regarding the events at issue here, 3:12-cv-804 and 3:12-cv-2301. Unless otherwise noted, all docket entry citations refer to the 12-804 case docket.

were charged with engaging in a pattern of corrupt activity in violation of Ohio law. William answered the door after Deputy Siefker arrived and truthfully told him Tamera and Donald were not at his home. Deputy Siefker informed William he expected William to contact the sheriff's department if Tamera or Donald came to his house and that William could be arrested if he failed to do so. In the ensuing days, two other sheriff's deputies unsuccessfully attempted to serve the warrants at William's home.

In the early evening hours of September 12, 2011, the PSCD received a phone call from an individual who witnessed Tamera arriving at William's home. The PSCD dispatched Deputy Scott Meyer to serve the warrants, after requesting and obtaining the assistance of Kyle Stechschulte, an officer with the Village of Leipsic, Ohio Police Department. Upon hearing over the PSCD radio that Deputy Meyer was on his way to serve the warrants, Deputy Siefker contacted Deputy Meyer to inform him of Deputy Siefker's previous attempt to serve the warrants and his conversation with William about the need to contact the PSCD if Tamera or Donald came to his home.

Deputy Meyer and Officer Stechschulte arrived at William's home approximately an hour after the phone call to the PSCD. William answered the front door after Deputy Meyer knocked. At first, William told Deputy Meyer Tamera was not at his home. (Doc. No. 106 at 41). William then admitted Tamera was present and stated he would send her outside, but would not permit Deputy Meyer to enter his home without a search warrant. (Doc. No. 106 at 41, 77-78). Deputy Meyer contends William did not tell him Tamera and Donald were inside. (Doc. No. 98 at 22). William continued to refuse to permit Deputy Meyer to come inside. Deputy Meyer then contacted Deputy Siefker to discuss what steps Deputy Meyer needed to take to procure a search warrant for William's residence. Shortly after the two deputies finished their conversation, Tamera and Donald exited William's home and Deputy Meyer took them into custody. (Doc. No. 98 at 25-26).

William remained inside with his three young grandchildren. Deputy Meyer had another phone conversation with Deputy Siefker, who had learned Tamera and Donald were in custody. Deputy Siefker told Deputy Meyer to take William into custody for obstructing justice. (Doc. No. 98 at 28; Doc. No. 99 at 9). Deputy Meyer then went to the nearby home of William's other daughter, Heather Wood, and asked her to return to William's home with him. Upon returning, Deputy Meyer and Heather entered the house and Deputy Meyer placed William under arrest. Deputy Meyer placed William in the front seat of Officer Stechschulte's vehicle and later moved William to the front seat of Deputy Meyer's vehicle before transporting William to the Putnam County Jail.

Upon arriving at the jail, William went through the jail's standard intake process with Gary Warren, a deputy corrections officer. Heather had gathered William's medications and medical supplies and placed them in bags to accompany William to the jail. Deputy Warren asked Heather Verhoff, a corrections officer, to contact the on-call nurse for the jail to review William's medications. Kathy Baird, a registered nurse with the jail, subsequently identified 31 medications. (Doc. No. 94-1 at 10-11). Among these medications was one known as Lovenox, which William informed CO Verhoff and Baird he took twice a day due to his history of strokes. (Id. at 7). CO Verhoff told Baird that William only brought one dose with him to the jail.

William began having some chest pain, which Baird treated and resolved with three nitroglycerin tablets. (Doc. No. 94-1 at 10). Baird later gave William his medications, including Lovenox, and informed William he did not have another dose of Lovenox to take the next morning. (Id. at 12). William told Baird that, if he was not released following his court appearance in the morning, his family could bring additional Lovenox to the jail, as he had more at home. (Id.).

There is a dispute regarding whether William had or received additional doses of Lovenox. April Patino, a licensed practical nurse with the Putnam County Jail, stated Heather brought three

3

doses of Lovenox to the jail on September 13 and handed those to Patino. (Doc. No. 95 at 19). Patino testified during her deposition that William injected himself with Lovenox before she left for the evening on September 13. Heather testified she was not asked to, and therefore did not, bring any individual doses to the jail, but sent a sealed and unopened box of Lovenox injections, which was returned among William's personal effects after William was transferred from the jail. (Doc. No. 105 at 26, 31-32).

What is not in dispute is that William received an additional two nitroglycerin tablets around 7:30 p.m. on the evening of September 13 after complaining of chest pain. Shortly thereafter, William's cellmate activated the intercom alarm in the medical unit to alert the staff that William was not doing well. CO Verhoff requested an ambulance, which transported William to Lima Memorial Hospital. From there, he was transported by life-flight helicopter to the Ohio State University Medical Center, where William was treated for stroke-related symptoms before being discharged to an in-patient rehabilitation center.

### III. STANDARD

A district court shall grant a party's motion for summary judgment if the movant demonstrates there is no genuine dispute of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The movant may meet its burden by showing there is an absence of evidence to support an element of a claim on which the nonmovant has the ultimate burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant has satisfied its burden, the nonmovant then must set forth "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). All evidence must be viewed in the light most favorable to the nonmovant, and all reasonable inferences drawn in the nonmovant's favor. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 390 (6th Cir. 2008). A factual dispute is genuine if a reasonable jury could resolve the dispute and return a verdict in the

nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A disputed fact is material only if its resolution might affect the outcome of the case under the governing substantive law. *Rogers v. O'Donnell*, 737 F.3d 1026, 1030 (6th Cir. 2013).

## IV. ANALYSIS

The Plaintiffs allege the Defendants[2] violated their rights in a number of ways. The Plaintiffs assert William's Fourth Amendment rights were violated through (1) the use of excessive force; (2) his wrongful arrest; (3) unlawful entry; (4) a malicious prosecution; and (5) former Sheriff James Beutler's failure to train and supervise his employees and his unconstitutional policies and practices regarding searches and seizures. The Plaintiffs also assert William's Fourteenth Amendment rights were violated through (6) deliberate indifference to his serious medical needs; (7) Beutler's failure to supervise, train, and take corrective action regarding medical care; and (8) Beutler's unconstitutional customs, policies, or practices regarding medical care. The Plaintiffs additionally assert common law claims for (9) assault and battery, (10) false arrest / imprisonment, (11) malicious prosecution, (12) medical negligence, and (13) loss of consortium.

The Plaintiffs further claim Sheriff Beutler violated the Americans with Disabilities Act by keeping William in the Putnam County Jail. The Defendants persuasively argue the Plaintiffs cannot state a prima facie case under the ADA, including because the Plaintiffs do not identify a covered disability and William did not request an accommodation for any alleged condition. The Plaintiffs did not respond. I conclude the Defendants are entitled to summary judgment on this claim as a matter of law.

### A. SECTION 1983 AND QUALIFIED IMMUNITY

To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must prove the defendant deprived the plaintiff of a right protected the Constitution or laws of the United States while acting under the

---

[2] I previously approved the Plaintiffs' dismissal of their claims against the Village of Leipsic, Ohio, the Chief of the Leipsic Police Department, Officer Stechschulte, and Dr. David Woodruff. (Doc. No. 53 and 67).

color of state law. *Gomez v. Toledo*, 446 U.S. 635, 640 (1980). The doctrine of qualified immunity shields state actors from § 1983 liability based upon their discretionary acts. *Anderson v. Creighton*, 483 U.S. 635, 638-40 (1987). Once qualified immunity is asserted, the plaintiff bears the burden of proving (1) he was deprived of a constitutionally-protected right (2) that was "so clearly established that a reasonable officer would understand that his or her actions would violate that right." *Thomas v. Cohen*, 304 F.3d 563, 569 (6th Cir. 2002) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *see also Anderson*, 483 U.S. at 640 ("[I]n the light of pre-existing law[,] the unlawfulness [of the official's actions] must be apparent.").

**B. WRONGFUL ARREST**

The Fourth Amendment requires that a police officer determine probable cause exists prior to making an arrest. *Baker v. McCollan*, 443 U.S. 137, 142-43 (1979); *Crockett v. Cumberland Coll.*, 316 F.3d 571, 580 (6th Cir. 2003). Probable cause to arrest exists if the police officer knows of facts and circumstances, at the time of the arrest, that are sufficient to support a reasonable belief "the suspect has committed, is committing[,] or is about to commit an offense." *Id.* (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)); *see also Estate of Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir. 1999). "Once probable cause is established, an officer is under no duty to investigate further or to look for additional evidence which may exculpate the accused." *Ahlers v. Schebil*, 188 F.3d 365, 371 (6th Cir. 1999).

Deputy Meyer arrested William for obstructing justice by harboring, in violation of Ohio Revised Code § 2921.32(A)(1). This statute, in part, prohibits a person from harboring another person with the purpose of hindering the discovery or apprehension of the other person. Ohio Rev. Code § 2921.32(A)(1). "Harboring requires an overt act which does, in fact, hinder the discovery or apprehension of the person sought by police." *State v. Connor*, 612 N.E.2d 421, 423 (Ohio Ct. App. 1992). An individual who uses oral statements with the intent "to deceive a police officer so as to

6

impede or delay discovery of the fugitive is harboring 'just as surely as if he had concealed him physically.'" *Id.* (quoting *State v. Hough*, 48 Ohio App.2d 304, 310 (1976)).

As he approached William's front door on September 12, Deputy Meyer knew a witness reported seeing Tamera and Donald enter William's house shortly before he arrived. He also knew the PCSD had made at least one other attempt to serve the felony warrants at William's house and that Deputy Seifker had informed William he needed to call police if his daughter and son-in-law came to his house. When Deputy Meyer asked William if Tamera and Donald were there, William said they were not. (Doc. No. 106 at 41) ("I said no"). The fact that William quickly decided this was not the appropriate course to take does not erase his initial statement. Tamera and Donald's exit from William's house confirmed to Deputy Meyer that William initially lied to him. From the facts and circumstances as Deputy Meyer knew them at the time, William probably had committed the offense of obstructing justice by harboring. *Thacker v. City of Columbus*, 328 F.3d 244, 256 (6th Cir. 2003) (Fourth Amendment "necessitates an inquiry into probabilities, not certainty." (quoting *United States v. Strickland*, 144 F.3d 412, 415 (6th Cir. 1998)).

The Plaintiffs assert William was arrested because he refused to permit Deputy Meyer to enter his home to arrest Tamera and Donald without a search warrant. They do not offer evidence to support this speculation and, more to the point, fail to acknowledge William's own characterization of his interaction with Deputy Meyer. (Doc. No. 119 at 14, 42); (*cf* Doc. No. 106 at 41) ("I said no"). The Defendants have established there was probable cause to support William's arrest and therefore are entitled to summary judgment on his wrongful arrest claim.

The Plaintiffs also claim Deputy Siefker is liable under § 1983 for an order he allegedly gave to, and actions he allegedly took in conjunction with, Deputy Meyer. A defendant may not be held liable under § 1983 based on a respondeat superior theory. Instead the plaintiff must show a supervisor "at least authorized, approved[,] or knowingly acquiesced in the unconstitutional

7

conduct." *Birrell v. Brown*, 867 F.2d 956, 959 (6th Cir. 1989). The Plaintiffs cannot prevail on this theory because probable cause existed to support William's arrest.

## C. MALICIOUS PROSECUTION

Claims of malicious prosecution are cognizable under the Fourth Amendment. *Thacker*, 328 F.3d at 259 (citing *Darrah v. City of Oak Park*, 255 F.3d 301, 310 (6th Cir. 2001)). To prevail on a Fourth Amendment malicious prosecution claim under § 1983, a plaintiff must show: (1) the defendant made, influenced, or participated in the prosecution decision; (2) lack of probable cause for the prosecution; (3) the legal proceedings deprived the plaintiff of his Fourth Amendment liberty protections; and (4) the criminal proceeding was resolved in the plaintiff's favor. *Sykes v. Anderson*, 625 F.3d 294, 308-09 (6th Cir. 2010). I already concluded Deputies Meyer and Siefker had probable cause to arrest William, and the same facts and circumstances supply probable cause for their roles in the institution of criminal proceedings against William.

The Plaintiffs also assert a claim against Beutler in his individual capacity for malicious prosecution. The Plaintiffs cannot succeed on this claim because there is no evidence Beutler had any personal involvement in William's prosecution. *See Birrell*, 867 F.2d at 959. Even if such evidence existed, there was probable cause to support the charges against William. The Defendants are entitled to summary judgment on William's malicious prosecution claim.

## D. EXCESSIVE FORCE

A police officer's use of force during an arrest violates the Fourth Amendment if that use of force was not objectively reasonable under the circumstances. *Graham v. Connor*, 490 U.S. 386, 395 (1989). The reasonableness of an officer's use of force is "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. The right to make an arrest necessarily includes the right to use "some degree of physical coercion . . . to effect [the arrest.]" *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, 22-27 (1968)). In determining whether an

officer's use of force was objectively reasonable, I must give "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396 (citing *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)).

William identified two instances in which Deputy Meyer used force. He asserts Deputy Meyer pushed or touched him in the chest when Deputy Meyer "was closing the door" and also touched him on his arm. (Doc. No. 106 at 83-84).

**Q:** Other than your belief that you were being unfairly arrested for harboring a fugitive, were you struck, mistreated, pushed, shoved, forced in any way, shape or form in the process of being arrested?
. . .
**A:** I believe that I was mistreated by that deputy. He [came] in there with an attitude and treated me very badly before I could even talk to him and he never let up the whole time.
**Q:** Did he grab you?
**A:** Well, he pushed me when he was closing the door.
**Q:** When you were closing the door on him?
**A:** No, no. He should never have come in my door.
**Q:** Where did he touch you?
**A:** He touched me in the chest.
**Q:** Anywhere else?
**A:** In my arm of course. That's my feeling.

(Doc. No. 106 at 83-84).

The Plaintiffs claim that Deputy Meyer shoved William while William was inside his home. (Doc. No. 119 at 14). Deputy Meyer denies having any physical contact with William. (Doc. No. 98 at 25). Though William does not provide further detail, the door Deputy Meyer closed most likely was the door of his car or of Officer Stechschulte's car. Similarly, William does not specify when Deputy Meyer touched his arm, but the most likely time appears to be when Deputy Meyer walked William from his house to Officer Stechschulte's car or from Officer Stechschulte's car to Deputy Meyer's car.

9

Neither of these incidents is clear, however, and neither side identifies any other evidence that might provide some context for the contact. The timing of the contact is material, as the use of force might be reasonable during the arrest and unreasonable if it occurred separately. The Defendants have not carried their burden of proof and therefore are not entitled to summary judgment on the Plaintiffs' excessive force claim.

### E. UNLAWFUL ENTRY

The Fourth Amendment prohibits law enforcement officers from entering a person's home without a warrant unless exigent circumstances permit entry or the individual consents. *Payton v. United States*, 445 U.S. 573, 590 (1980); *State v. Kessler*, 373 N.E.2d 1252, 1255 (Ohio 1978). Exigent circumstances include the hot pursuit of a fleeing felon, the imminent destruction of evidence, prevention of a suspect's escape, and the risk of danger to the police or others in the community. *Minnesota v. Olson*, 495 U.S. 91, 100 (1990).

The Defendants first argue that Deputy Meyer did not enter Muncy's home, but arrested William in the doorway of his house. William and Heather both testified, however, that Deputy Meyer came into William's home. (Doc. No. 106 at 48; Doc. No. 105 at 17). Thus, taking the evidence in the light most favorable to the Plaintiffs, a reasonable juror could conclude Deputy Meyer violated William's Fourth Amendment rights by entering his home without a warrant.

The Defendants next argue Deputy Meyer is entitled to qualified immunity because his "actions were in accordance with Ohio statutory law." (Doc. No. 128 at 26). I cannot agree. William clearly informed Deputy Meyer he did not consent to Deputy Meyer's request to enter his home. (Doc. No. 98 at 22). Moreover, the Defendants do not argue any recognized exigent circumstance existed to justify a warrantless entry, and there is no evidence to support such an argument.

10

The right to be free from warrantless entries into the home was clearly established at the time of the incident. *See, e.g., Payton*, 445 U.S. at 590; *State v. Bowe*, 557 N.E.2d 139, 141 (Ohio Ct. App. 1988); *State v. Alihassan*, 2012-Ohio-825, at ¶ 6 (Ct. App.). More specifically, the right to be free from warrantless entry into the home when the homeowner has manifested his desire to keep his home private by closing the door on an officer – as William did – also was clearly established. *Zar v. Payne*, 760 F. Supp. 2d 779, 789 (S.D. Ohio 2011) (citing *Cummings v. City of Akron*, 418 F.3d 676, 685-87 (6th Cir. 2005)).

The Defendants argue Deputy Meyer's entry into William's home was objectively reasonable because he had a duty to arrest anyone he observed committing a felony. *See* O.R.C. § 2935.03. This is not persuasive, as the statute cannot override clearly established Fourth Amendment jurisprudence. Though they concede it is not applicable here, the Defendants also argue Ohio Revised Code § 2935.12 – which sanctions an officer's forcible entry into a home after being refused admittance – may have given Deputy Meyer a "mistaken belief" as to whether he could enter. Ohio courts repeatedly have held O.R.C. § 2935.12 only applies when the officer makes a forcible entry into the home and is inapplicable when the officer enters through an unlocked door – as Deputy Meyer allegedly did here. *See State v. McDivitt*, 2012-Ohio-2243, at *33 (Ct. App.) (citing cases). Moreover, Deputy Meyer does not indicate, at any point, that he believed he had a basis for entering William's home without a warrant. (*See* Doc. No. 98 at 22-23). Taking the facts in the light most favorable to the Plaintiffs, I conclude the Defendants fail to show a reasonable officer would believe entry into William's home was consistent with William's constitutional rights and Deputy Meyer is not entitled to qualified immunity. *Anderson*, 483 U.S. at 638-39.

F.  **FOURTH AMENDMENT *MONELL* CLAIMS**

A county government may not be held liable under § 1983 unless it unconstitutionally "implements or executes a policy statement, ordinance, regulation, or decision officially adopted by

11

[its] officers" or tolerated a custom or practice that led to the deprivation of constitutional rights. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978). If an individual law enforcement officer did not violate a plaintiff's constitutional rights, the plaintiff's claims against the law enforcement agency fail as a matter of law. *Tanner v. Cnty of Lenawee*, 452 F.3d 472, 481-82 (6th Cir. 2006). Thus, the Plaintiffs' *Monell* claims fail as to their claims for wrongful arrest and malicious prosecution. Additionally, the Plaintiffs do not offer any evidence to show the PCSD had a policy or custom that condoned warrantless entries into the home absent consent or exigent circumstances, or the use of excessive force by officers. The Defendants therefore are entitled to summary judgment on the Plaintiffs' Fourth Amendment *Monell* claims.

### G. REQUEST FOR ADVERSE INFERENCE

In their opposition brief to the Defendants' motion for summary judgment, the Plaintiffs include a request for a jury instruction mandating an inference adverse to the Defendants because the Defendants failed to retain audio and video recordings from the Putnam County Jail contemporaneous to the events at issue in this litigation. While the Defendants argue the Plaintiffs' request is improper and untimely, the decisive factor is that their request is not relevant to a motion for summary judgment. The Plaintiffs already are entitled to have the facts viewed in the light most favorable to them, and their request for a jury instruction – in essence a motion in limine – adds nothing to this standard. *See White,* 533 F.3d at 390. Therefore, at this stage, the Plaintiffs' request for a jury instruction mandating an adverse inference from the absence of video and audio recordings is denied.

### H. ACCESS TO MEDICAL CARE

The due process clause of the Fourteenth Amendment protects the right of pretrial detainees like William to adequate medical treatment analogous to the rights of prisoners under the Eighth Amendment. *Watkins v. City of Battle Creek*, 273 F.3d 682, 685 (6th Cir. 2001) (citing *City of Revere v.*

*Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)); *Bell v. Wolfish*, 441 U.S 520, 545 (1979). Constitutional claims for the denial of medical care have an objective and a subjective component. The objective component requires that the plaintiff suffer from a "sufficiently serious" medical issue and the conditions the plaintiff faced constitute a substantial risk of serious harm. *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

To satisfy the subjective component, the plaintiff must show prison officials have "a sufficiently culpable state of mind" – one of "'deliberate indifference' to inmate health or safety." *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (quoting *Farmer*, 511 U.S. at 834). An official was deliberately indifferent if the official knew of and disregarded an excessive risk to inmate health or safety. *Brown*, 207 F.3d at 867 (quoting *Farmer*, 511 U.S. at 837). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

The Defendants are not entitled to summary judgment on the Plaintiffs' Fourteenth Amendment claims because there is a genuine dispute of material fact as to whether the individual Defendants were deliberately indifferent to William's medical needs. The Plaintiffs have established William has a history of strokes and he has a prescription for Lovenox, a medication designed to prevent blood clots and thus strokes. Additionally, it is undisputed the Defendants thought William did not arrive at the jail with sufficient Lovenox to maintain his typical dosing schedule. (Doc. No. 94-1 at 12).

The Defendants assert William told Baird his family would bring in more Lovenox if he wasn't released from the jail following his arraignment and that his daughter Heather handed Patino several individual syringes of Lovenox on the afternoon of September 13. Heather denies bringing in additional Lovenox and that she even was told William needed more of that medication. (Doc. No. 105 at 26). Heather also claims she sent with William a sealed and unopened box of Lovenox,

13

which was returned to her in the same condition following William's transfer to the OSU Medical Center. The Defendants do not have records documenting the additional Lovenox, and the audio transcripts they allege support their version of the events contain only generic references to "medication." As William arrived at the jail with over 30 different medications, this falls short of the conclusive proof the Defendants must offer to prevail on summary judgment.

Additionally, the Defendants' contention that William did not treat his risk of suffering a stroke as a serious medical condition is not persuasive. William told Baird, through CO Verhoff, that he took Lovenox twice a day because of his history of strokes. (Doc. No. 94-1 at 7). William did not inform any of the Defendants, at any time, that he did not need this medication. Further, while the Defendants claim William did not take Lovenox regularly before he was arrested, William testified during his deposition that he "generally" took one dose in the morning and one in the evening. (*See* Doc. No. 106 at 74). It is the jury's role to sort out discrepancies such as this one.

The PCSD also is not entitled to summary judgment on the Plaintiffs' Fourteenth Amendment *Monell* claims. There is a genuine dispute of material fact regarding whether the individual Defendants violated William's right to adequate medical care. The sheriff's department did not have a policy addressing documentation of medications entering the jail, and thus the Defendants failed to identify and utilize an entire box of Lovenox syringes. Moreover, the Plaintiffs assert the PCSD did not train employees on the appropriate course to take when a detainee needs additional prescription medication. This issue is not moot, as the Defendants claim, because Baird thought William did not have another dose of Lovenox to take on the morning of September 13. The Defendants fail to carry their burden of showing a reasonable juror could not conclude there was a causal connection between PCSD customs and the alleged violation of William's constitutional rights. *See, e.g., City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *Alman v. Reed*, 703 F.3d 887, 902-903 (6th Cir. 2013).

14

### I. STATE LAW CLAIMS

Under Ohio law, political subdivisions are granted broad immunity from suit. O.R.C. § 2744.02. There only are limited exceptions to this rule, which the Plaintiffs concede are not applicable here. O.R.C. § 2744.02(B). Therefore, I conclude the PCSD is entitled to summary judgment on all of the Plaintiffs' state law claims.

Ohio law provides the employees of a political subdivision with immunity from lawsuits which seek damages for a person's injury or loss "allegedly caused by any act or omission in connection with a governmental or proprietary function." O.R.C. § 2744.03(A). An employee is not immune from liability if "[t]he employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities," or the "acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner." O.R.C. § 2744.03(A)(6)(a)-(b).

The individual Defendants are entitled to summary judgment on the Plaintiffs' state law claims for assault, battery, wrongful arrest, false imprisonment, and malicious prosecution. I concluded above that William's arrest was supported by probable cause. Further, to establish malice, the Plaintiffs must show Deputy Meyer acted with "the willful and intentional design to do injury, or the intention or desire to harm another, usually seriously, through conduct which is unlawful or unjustified." *Davis v. East Cleveland*, No. 1:03-cv-2075, 2006 WL 753129, at *14 (N.D. Ohio, March 22, 2006) (quoting *Cook v. City of Cincinnati*, 658 N.E.2d 814, 821 (Ohio Ct. App. 1995)). Even if I assume Deputy Meyer touched William's chest and arm at a time other than while he was arresting William, there is no evidence Deputy Meyer intended to harm or injure William. The Plaintiffs fail to show the Defendants are not entitled to statutory immunity on these claims.

The individual Defendants are not entitled to summary judgment on the Plaintiffs' state law claims for medical negligence and loss of consortium. Under Ohio law, an individual acts in a wanton manner by failing "to exercise any care toward those to whom a duty of care is owed in

15

circumstances in which there is a great probability that harm will result." *Anderson v. Massillon*, 983 N.E.2d 266, 273 (Ohio 2012) (citing *Hawkins v. Ivy*, 363 N.E.2d 367, 369 (Ohio 1977)). "Reckless conduct is characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances . . . ." *Anderson*, 983 N.E.2d at 273. I concluded above that there is a genuine dispute of material fact as to whether the Defendants were deliberately indifferent to a known risk to William's health. Likewise, there is a genuine dispute as to whether a jury could find that the Defendants' acts or omissions were reckless. Therefore, statutory immunity does not apply to the Plaintiffs' state law medical and loss of consortium claims.

## V.  CONCLUSION

For the reasons stated above, the Defendants' motion for summary judgment, (Doc. No. 86), is granted in part and denied in part. The Defendants are entitled to summary judgment on the following claims: (1) under the Fourth Amendment for wrongful arrest and malicious prosecution; (2) assault, battery, wrongful arrest, false imprisonment, and malicious prosecution pursuant to state law; and (3) the Fourth Amendment claims against the PCSD under *Monell v. Dep't of Soc. Servs.* The Defendants are not entitled to summary judgment on the Plaintiffs' claims (1) under the Fourth Amendment for unlawful entry and use of excessive force; (2) under the Fourteenth Amendment for deliberate indifference to medical needs; and (3) for failure to provide medical care and loss of consortium pursuant to state law.

So Ordered.

s/ Jeffrey J. Helmick
United States District Judge